Good morning, Your Honors. Dennis Reardon for Appellant Lazarenko along with Doren Weinberg. Your Honors, this is an extremely important case, and not simply because, as Judge Jenkins said below, it contained more issues of first impression than he could well list in an afternoon session. This is the most aggressive attempt by the United States government ever to prosecute a foreign citizen for conduct occurring on foreign soil. It was perhaps inevitable in the age of globalization that the United States would move away from the attitude reflected in the Foreign Corrupt Practices Act, where the Congress said we'll prosecute Americans abroad if they do something wrong, but not the foreigners they might interact with. But in this age of globalization, what's sauce for the goose is sauce for the gander. We are going to see Americans and foreign jurisdictions attempting to prosecute Americans for offenses that may well occur only, allegedly, on American soil, because we're starting to see money that used to only be in dollars go into things like euros. So if a financial connection is enough to allow a foreign jurisdiction to exercise criminal jurisdiction over an American, we're going to see prosecutions in other countries like this, and our ability to demand fairness and due process for our citizens if they're being charged in a foreign jurisdiction is going to depend on the fairness of the principles that we apply to foreign citizens such as Mr. Lazarenko when there's this effort to exercise extraterritorial jurisdiction. And in that regard, let me begin, and I can be brief, about the lead argument we have here, because the critical thing here is the United States Supreme Court says if you have to prove something, you have to plead it. If you don't have to prove it, you don't have to plead it. The United States government has taken the position that in this case, when it charged Mr. Lazarenko in a case that was wholly rested on the notion that he engaged in corruption in Ukraine, not here, during the entire period of time we're talking about here, he was a public official in Ukraine, they are saying that we do not have to prove that anything he did in Ukraine violated Ukrainian law because we don't have to plead it. If they don't have to plead it, they don't have to prove it. And so imagine what we are saying to the world. We are saying that if some country grabs one of our citizens on the notion that some of their money may have passed through their financial system, they could prosecute someone in their country, for instance, on the grounds that this individual violated their statutes against the production of alcohol, which is a capital offense in some societies, violated, for instance, in Germany, the prescription about writing anything that denies the Holocaust. Or an insult to a foreign religion, even though that conduct occurred solely in the United States and is protected by our laws. We have to take the position, and Judge Jenkins was absolutely right, that if you are going to prosecute Mr. Lazarenko on the theory that he somehow deprived the citizens of Ukraine of honest services, you are going to have to prove that he offended their criminal laws. Judge Jenkins was right. He instructed the jury in that way. But the government, it was never pled, and therefore the indictment was defective. And the government, by reverting to its position saying it didn't have to plead any foreign criminal violations, is saying that it didn't have to prove any. And that's an enormous threshold question that this court will have to confront. I'd like to move to the second area, which is, because there's been some activity by the United States Supreme Court, I'd like to address the greatest number of convictions, which are the money laundering convictions. And the argument there is simply that if Mr. Lazarenko hired a lawyer and said, find out for me in 1999 whether I commit the crime of money laundering if I bring to the United States money which is alleged to have been obtained by foreign corruption, by either bribery or theft from the Ukrainian government, am I breaking the money laundering laws of the United States? The Justice Department of the United States would say, no, you are not breaking our money laundering laws because bribery and foreign corruption offenses are not a predicate offense under our money laundering laws. We are trying to change that. If the same lawyer followed the legislative debates in 2001 following 9-11, he would see Senator Sarbanes saying, we have to change the laws. Milosevic, and this is his words, Milosevic, or this is Stuart Eisenstadt of the Department of Justice, if he brings money here from bribery or corruption, we cannot prosecute it as money laundering. We must change the laws. And they did change the law. Could I just ask you to pause for a moment here? Is this argument you're making come back to whether extortion somehow, at least in the context of this statute, should be read more narrowly to not include, in effect, bribery and foreign corruption? Yes, Your Honor. Our argument is that Congress said bribery and foreign corruption is not a crime in 2001. The government's argument is, wait a minute, they added the term extortion to the money laundering predicates in 1992, and extortion, as we know under Evans, means bribery. Well, here's the problem with that. In Evans, the United States was not interpreting the term extortion. Extortion had been defined by Congress in two different ways, violent threats, A, or getting money under color of official right. So the argument in Evans was about whether, now it's defined as two separate things there. What did they mean when they said under color of official right? In a 5-4 opinion, the Supreme Court said under color of official right didn't require inducement because extortion, as it was defined in common law, was only bribery, and it didn't require inducement, a big fight between the majority and the minority on that score. So you had two definitions of extortion in Evans. The question here is when Congress used the term extortion, what did it mean? Did it mean one of those or both of them? What did it mean? Well, we know that included the term extortion and said we're adding violent offenses that could be committed by terrorists. So given that legislative history, that's a pretty good indication that they want a crime of violence in there. The government says no, they meant it's common law meaning. Well, that would mean, if the government was right, it would mean they said, oh, we want murder and kidnapping and extortion in the old common law sense, which only means bribery and doesn't mean threats of violence. It's only a nonviolent offense. So we added a nonviolent offense in the list of violent offenses. Why would Congress do that? Well, we know they didn't do that because eight years later they were saying we've got to rectify this because we don't have bribery in here. So we know from Evans there's two meanings of bribery, violent and nonviolent. Which one did Congress intend? We know that they had it on a list of violent crimes. We know that eight years later they were saying, boy, we didn't include bribery, let's include it in there. We know that between our argument that extortion only meant violence and their argument that it somehow incorporated the common law definition of extortion, that those are two equally plausible, at best, interpretations. We know the Justice Department's highest officials thought it didn't include bribery. And we know this, and this is where Justice Scalia comes in last week. A tie goes to the runner and a tie goes to the defendant. We've got two money laundering decisions in the last week in which the Supreme Court rejected expansive definitions of statutory language in the money laundering statute and said, oh, no, it's the rule of lenity. If at best you have a tie, then we rule for the defendant. Let me just go back. If Justice Scalia were looking at this, the other thing he might say, I would imagine, would be, but of course, I don't have any need to look to any legislative history if, in fact, there is a word that can be interpreted by common understanding and reference. And extortion would be one such word. Well, he wouldn't say that for this reason, Your Honor, because Judge Stevens, Justice Stevens in Evans said, we'll go with the common law definition provided there's no contrary indication in the legislative history. That's Judge Stevens' opinion in Evans at 504-264. Nothing in the legislative history that could point in a contrary direction. One difficulty here is that we would then invoke another one of how these, I'm sure from looking at this, all these statutory construction arguments kind of fall on each other and circle around. The other argument or principle of statutory construction, of course, is that if you were to look at legislative history, I would assume in that case, in the Evans case, they're looking at the legislative history of that statute, not a subsequent statute or a different statute. Well, and let me add this. Justice Stevens said in Evans, there's been 20 years of interpretations of extortion in the Hobbs Act. The appellate courts for 20 years have said it means it requires an inducement. So we're not going to interfere with that because Congress for 20 years has gone along with the definition. We've got the converse. We've got Congress here looking at the term extortion and saying, hey, you know, extortion doesn't cover bribery. We better do something about it. So that's why the Department of Justice in 2001 said we've just passed the Patriot Act for the first time. We can now prosecute foreign bribery offenses. So you've got a very strong legislative history that establishes that the term extortion did not mean bribery when it was passed in 1992. A very powerful record in that regard. And listen, are we really going to say that Pavel Lazarenko or even an American citizen is supposed to have an understanding and a perception of the 1992 amendment that people so dumb as the head of the Department of Justice are going to say, well, this is a very powerful record. For legislative affairs and Senator Sarbanes didn't have, because they were under the mistaken impression that extortion didn't include the term bribery when it's just plain as day that it did. It's not plain as day. It's not plain as day at all because Senator Dimato said in 1992 when they were passing the statute, we are going after violent offenses by terrorists. The thing is in Evans, Your Honor, they defined extortion. They gave it two separate definitions. Here we have no definition of the term, everything to suggest that it's only violent at the time it's passed, only violent actions, and then we have Congress vindicating that view by amending the money laundering statute in the wake of 9-11 with the Patriot Act. So we think that the most the government can say is that its interpretation of the extortion statute is reasonable, but it's no more reasonable than the view we've espoused, which is the view that prominent senators and the Department of Justice itself, the Department of Justice now has to say, hey, we were dumb eight years ago when we were urging Congress to expand the money laundering statute. Boy, how did we not realize that the term extortion passed in 92 included the very foreign bribery that we're now trying to add to the act in 2001? And again, interestingly, in Evans, Justice Kennedy, who's in the 5-4 majority, says, however, let me say I agree with the four judges, Justice Scalia, by the way, dissented in Evans, Justice Scalia, Justice Thomas, that we do have to follow the rule of lenity in all of these cases. If the United States Supreme Court can distinguish between, as it did in Cuellar, between transportation for the purpose of hiding and hiding for the purpose of transportation, and find that that ambiguity means that you have to give the interpretation most favorable to the defendant, the United States Supreme Court is going to say that a citizen, a person like Mr. Lazarenko, should not be held to a reading of the money laundering statutes that not even the Department of Justice was able to read. Or was able to come up with in the year 2000. Passing on to wire fraud. What is it? Why do we have a wire fraud case? Why do we have five counts of wire fraud? The allegation is that between 1992 and 1995, Pavel Lazarenko came up with a scheme to get money from his friend, Kirichenko, and to engage in obscure wheat deal in between two state entities in Ukraine, Nikopol and Nikovi. Well, that's none of our business. Okay. Then it gets to 1995. The money that allegedly was gained from that activity is moved to a Swiss bank account. That's none of our business. We don't have any interest in it. We don't have any connection with it. Where does the connection come? In 1997, there's these five, between 1997 and 1998, five transfers of money into bank accounts in the United States, very briefly while the money is on the way to somewhere else. Do we have jurisdiction over this obscure wheat deal in 1992 because those five transfers contain illegal proceeds from 1992 to 1994? No. Judge Jenkins said the government utterly failed to prove that any of those five transfers contained tainted funds because, he said, there was no proof that under the tracing principles applicable to ITSP, international transportation of stolen property, that those five transfers, and he was judging those in the ITSP context, contained any, quote, unquote, dirty money at all. So if there's no dirty money in them, how do we get jurisdiction over them? Well, the government's theory now is that, well, there wasn't, we didn't prove there was any illegal proceeds in them, but we proved that they came from a foreign bank account that may have had illegal proceeds in it. This is a question of first impression. They're asking this court in the most attenuated context to say that we have jurisdiction over this wheat deal or this cattle deal, I should say. The wheat deal is somewhere else. We'll get to that. This cattle deal, because there was allegedly a tainted account in Switzerland that money might have come from. Can we just step back and make sure I've got the right counts? Yes. Because I've got these little charts. So do I, Your Honor. I can't be without them. I spent the weekend drawing them up. So let me go back. These arise out of the charcoal transact? Yeah. These are transfers from various accounts, Carpo, Eurofed, Lady Lake, to Eurofed. 25, 26. 25, 26, 27, 28, and 29. Yes, Your Honor. I'm on the same page. Yes. So now those same transfers, the wire transfers, are charged as international transportation of stolen property in counts 48, 49, 50, 51, 52. Judge Jenkins acquits on these, and the government has not appealed that ruling. He says you failed to prove that there was any tainted funds in those five counts, so you lose. So there's no money in them. There's no dirty money in those accounts. He said Before you get to that, these come from also counts 25 and 26, anyway, come from the two 14 million transfers that may have been alleged to be UESU, correct? Well, the reality, Your Honor, is that the government, when it started out, didn't have any of these problems of proving money up because all of these transfers were UESU money. That was their theory. This is the $180 million that he stole from the people of Ukraine from the energy industry. So the last thing they had to worry about was whether these contained, quote, unquote, dirty money. But Judge Jenkins said you didn't prove there was any illegality there at all. Then they're scrambling So let me go back to the indictment, then. If you read part of the indictment where it talks about the UE, whatever, the energy, the energy money, and then it says these two $14 million. Exactly, Your Honor. The answer, I think, from the government is, well, okay, there is that part, but then we've got this big catch-all, everything could be everything. Right. What's the best authority, in your view, that these need to be read in the context of where they are in the indictment and what was charged there? Well, you know, I suppose we're relying on Sterone. We're relying on cases such as Shipsy. I mean, in Sterone you had a situation, the United States Supreme Court case, where there's an allegation that someone is interfering with transportation into the state, and they do a pretty good job of proving that they're interfering with transportation out of the state, which would be an offense. The guy's convicted. The Supreme Court says, wait a minute, there might have been plenty of evidence to convict him of that crime, but that wasn't the crime that he was charged in. Not like a catch-all? Do we have any cases where the catch-all gets to catch whatever? What? Like a catch-all in an indictment. Well, you know, I think it's a fair notice requirement, Your Honor, and the reality is the government never even thought to suggest that these late 1997 wire fraud transactions had anything to do with Kirichenko or particularly this cattle deal, because they were swimming around in what they thought was the reason they brought the case, the $180 million of political corruption that turned out not to be illegal at all. That was the fair reading of the indictment. That was the way that they were portraying all of these. And look how simple it gets. The U.S. money was definitely floating around in 1997. So you've got a 1997 wire fraud. What's it doing there? It's clearly part of a scheme vis-à-vis UESU. UESU gets thrown out of the case, and they're trying to say that these 1997 transactions were part of a scheme involving the cattle back in 1992. Under Lowe, this Court's decision in Lowe, these transfers, even if they contained illegal money, which they didn't, cannot be viewed as part of a wire fraud scheme involving the cattle deal, unless at the time of the cattle deal in 1992, it was part of the plan to move the money in 1997. And that's nonsense. I mean, there was no plan to move it to the United States in 1997. Even the government's own witness said the reasons for these transfers in 1997 arose in 1997. So at that point... How proximate do you have to be, not so much in a temporal scope, but what if your scheme at the outset was not necessarily to move it into the U.S., but to move it around so it didn't get found? Would that be enough? If that were the case. Let's say we were in Switzerland, and the allegation was to get the money out of Ukraine, and it got it to Switzerland. You could make a fair argument the plan was to get it out of Switzerland. Out of the Ukraine into Switzerland. But the money sat in Switzerland for two years before it was moved to the United States. And it is absolutely clear that the decision to move it to the United States had nothing to do with the cattle deal or the agreement about that at all. It had to do with considerations, well, we will now... Now, you know, there are a set of laws that apply when you try and hide proceeds later, two years later, five years later. Those are money laundering laws. But they couldn't charge money laundering in bringing the money to the United States, because they needed a predicate offender. So they come up with the wire frauds. But there's this incredible, the reality is that there's this incredible superstructure, complex superstructure, to bring the case to the United States, which the whole rationale for it was UESU and this enormous alleged corruption. But it turns out that that corruption was the kind of political activity which led to the demise of the Kuchma regime. And the Orange Revolution, which we supported. Once you pull UESU out of the thing entirely, what's left doesn't make any sense as a criminal case. And very briefly, because I want to spend a couple of moments of it, we've discussed the notice argument that would wipe out the entire case. We've discussed the eight money laundering charges. We've discussed the five wire fraud charges, which leaves us with one lonely charge, which is a stolen property, transportation of stolen property, count 31, from 1994, based on this wheat deal in 1992. We are looking at a situation in which an American jury in San Francisco is asked, would you please figure out whether when Nikopol in the Propostrovsk lent $2 million to Nikovy in Ukraine to buy wheat, was that fraudulent, was the wheat purchased? We don't really know. Mr. Agafonov, who is the head of Nikovy, is dead. We can't subpoena any of his documents. And it's still none of our business, unless you can conclude some of it arrived here in 1994. But along the way, it went through an account in Hungary, and the United States government agrees that it has no idea what happened in that account. And its own principal witness has said he cannot link the money that went into this post-bank account in Hungary to the account in Ukraine. So the government agreed to the money that went out. What are we doing with this? What are we doing with this? And on this count, which is 31, correct? Yes. You're then, I think the government agrees that this is the lip handle. Yes. It leaves the foreign bank to come to Bank of America. Right. And on that, I think they agree that you would have to have tracing such that you would have to have enough. If you had enough, maybe I should set it backwards, if you had enough clean funds to come to the U.S., that there wouldn't be a crime. That's right. And they have. And so then they say, well, but there's some evidence that they must have known. They must have known this sweet deal didn't go down because everybody says that, you know, it's 50-50 deals and this didn't seem to come to pass. How does that affect what money was in lip handle bank? Well, they've got the problems of proof with with the wheat deal. I mean, the loan from one state entity to the other was all a wheat deal problem. This is all a wheat deal problem. This is all the Nicopole lends money to Nikovi to buy wheat. Two point four million. And the allegation is that half of it goes to Lazarenko. The loan gets paid back. So I don't know how we can conclude that money goes to Lazarenko. I mean, that the money wasn't invested appropriately and Nicopole was paid back, which is. Let me just stop there. I was trying to understand the significance of that. The loan gets paid back. And then the only thing I could find on that topic was, well, maybe the currency had been devalued. But is that like if if you and I had a loan for three million Ukraine and then you pay it back five years later, the currency isn't worth as much. It's still paid back. But the currency has changed. Is it a question of flow? Your Honor, imagine if Ukraine and these things will happen in these days, unlike before, were to loan us money in dollars and then we paid it back in dollars. They'd go, my God, it's been devalued by 40 percent. We want euros. I mean, the fact that currency is devalued. The evidence is that it was paid back in the currency in which it was lent. No, the evidence was that it was paid back in a different currency. But for an equivalency of those. I mean, that's what was sort of unclear. That's right. That's right. And it should remain unclear, Your Honor, because how the heck are we going to understand anything about a 1992 wheat deal between two state entities in Ukraine? And why should we care? But the easiest way to deal with this is that the government does have the burden of proving at every step in the chain that that is this pass through accounts, the transfers out, which eventually wound up in lip handle and then in the Bank of America. We're biting into dirty money because that's the on this count. Count thirty one. Doesn't the government also have an alternative theory? Right. That, you know, this transaction itself was part of the fraud. Well, yeah, here's the way that goes, Your Honor. And here's the big gaping hole in this. They realize they've got this huge problem with with post the bank and going money going in and going out. So they said, wait, wait a minute, we're going to take the position that the post the bank account was owned by Nikovy. So the theft occurs when when the Nikovy anything Nikovy sends out to Lazzarenko would, by that definition, be dirty money. And so let's forget about everything before that. But the truth of the matter is they're alleging fraud. And fraud occurs when you convince somebody by a false pretense to give you money. Their theory of the fraud is that Nikopol was defrauded by being told they'd buy wheat and into giving the money to Agafonov. So they can't possibly argue that. But they're saying it wasn't completed. Right. The fraud. Isn't that their theory? Government, sir? Well, they're certainly saying that this crime, they can't even begin to argue that this crime was completed unless it got to the United States, because that's the crime that he's charged with. But but but they they have to prove that money was, well, fraudulently attained by Nikopol. If they're saying all we have to do is that prove that money came out of the Nikovy account to Lazzarenko, that money could have been for anything. In fact, if it was a bribe, it wouldn't be theft at all. It wouldn't be ITSP. So they are. Is it enough to say, well, there was a 2.4 loan or amount and this is half and he's he tends to do business 50-50. Therefore, is that enough indicia of anything? Oh, here's why it isn't, Your Honor. We don't know too much. So let's say the situation is this. Let's say Agafonov gets the 2.4 million, right? He invested, he makes some money, he pays back Nikopol and he decides to kick off over 1.2 to Lazzarenko. That that that is that is perhaps an illegal kickback. That's not the theory of that. That doesn't constitute theft for the purposes of ITSP. The pled theory of theft is that the fraud occurred when the Nikopol surrendered the 2.4 million dollars. And let let me leave you with this. Look what a tough question this is. Look at what we're debating about here. Count 31, this deal in Ukraine. Does anyone really believe that a jury, an American jury that heard 250 million dollars of money floating around in all accounts, put aside all of that as they should have once the acquittals came in and decided count 31 without any reference to all the other accounts? All of this noise about UCSU. We know this jury was irrational because we know that Judge Jenkins found 15 of the 29 counts and said, I'm going to set those aside because no reasonable jury could have convicted of ITSP or wire fraud in that context. We know the jury was badly misled by something. If there is going to be a fair trial on count 31, shouldn't there be a trial on count 31 where a jury isn't exposed to allegations? And in closing argument, critical statements, closing argument by AUSA Borsche, all the money is illegitimate. And the the lip handle account is tainted as soon as any bad money goes in there, which is not the tracing principle they had to apply. So there is just no possibility that if the court were to conclude that these various other accounts are invalid, and even given Judge Jenkins' assessment of what was invalid, that there was a fair and impartial verdict on this little count, a million dollars, but within the context of this case, this single count involving a 1992-1994 chain of events. I have exhausted my time. Thank you. Good morning. May it please the court, Hartley West for the United States. Your Honors, the defendant was a public servant who extorted and took by fraud millions of dollars, and then he used United States banks to conceal it. This is exactly the kind of conduct that our money laundering laws were designed to prohibit, and none of the defendant's arguments supports overturning his convictions. I'll take the arguments in the same order that the defense addressed them, unless Your Honors have questions. Of course, feel free. When you say he extorted, you mean under the new definition or the old? The new definition of extortion? Are you referring to the- You say he extorted. You mean extorted under the new definition or the old definition of extortion? Well, I'm confused by the new versus old. Is Your Honor referring to the bribery inclusion in the money laundering statutes? Your Honor, the definition of extortion has remained the same, and under that old extortion, there has been no dispute that extortion is and was identified as a specified unlawful activity under 1956C7B2. Nor is there a dispute that both extortion under color of official right and by threat of economic harm was unlawful in Ukraine at the time, and the relevant statutes in Ukraine were 165, 168-2, those two statutes. The question here is what extortion means under section 1956, and Santos directs the court in interpreting it to look at the common law meaning, what the term was, what its ordinary meaning was, and then if there's ambiguity there, to proceed to the second step. Does the term have a common meaning in the federal criminal code? And under both of those steps, extortion here was encompassed. Evans did say that the common law definition of extortion was under color of official right, and just as the Supreme Court has held that we presume Congress meant to incorporate that common law definition of extortion in the Hobbs Act, so must it be presumed here. Similarly, Congress was aware that extortion under the Hobbs Act included also extortion by threat of economic harm, as stated in the Marsh case. And Congress... There's jumping and overlapping principles of statutory construction here. Sometimes one of the principles we use is you kind of, words are judged by the company they keep, and so extortion here is used in a context of, in effect, violent-type crimes. At least those are the other two that are listed there. And then you have Congress, or the Attorney General, and later various Congress people saying, look, you know, we kind of have a hole in our statute, and we better plug it. Can we look to that if there is some question? Yes, we can. In Santos, the court stated that that's step three. Does the context of the statute resolve any ambiguity? If the common law leaves ambiguity, and if there's no common definition under the federal code, then you would go to step three, which is does the context of the statute resolve the ambiguity? And I would like to address, because it seems that Your Honor may be concerned, about the fact that Congress did then adopt bribery as a separate specified unlawful activity. These offenses are not coextensive. They do overlap. But if somebody did not solicit a bribe, but merely accepted one, that would not be extortion. The defendant here was not charged with bribery, with merely accepting a bribe. He was charged with extortion. And the evidence was that the defendant did not just accept bribes. He extorted payments of 50 percent of Mr. Kirichenko's profits. And the special verdict form confirms that the jury found, beyond a reasonable doubt, that that extortion was committed. So, looking under the principles of statutory interpretation, statutory construction, the fact that the common law meaning includes extortion under color of official right, and that the Hobbs Act included, quite plainly, both that and by threat of economic harm, Congress must be presumed to have adopted that common law meaning and that commonly accepted federal code meaning when it enacted the money laundering statute. We don't even need to reach legislative history, but as Your Honor pointed out, the legislative history deals with the bribery, which is distinct. It does overlap, as Evans confirmed, that there is overlap, but they are distinct offenses. So I want to go back to Judge Tashima. You asked me when I was beginning the sufficiency of the indictment on the extortion. The government, when in the indictment, the indictment was sufficient, as measured by Resendez-Ponce just last year, in which the Supreme Court reaffirmed that an indictment is constitutionally sufficient if it contains the elements of the offense charged, fairly informs the defendant of the charge against which he must defend, and enables him to plead an acquittal or conviction and bar future prosecutions for the same offense. And the defendant's indictment satisfied all of these criteria. With regard to the money laundering offenses, this Court stated in Savage and in Latham, and I believe, Your Honor, Judge Tashima was on the panel in Latham, it confirmed that the text of these money laundering statutes contains every essential element of these money laundering offenses, and therefore an indictment tracking the statutory language is sufficient. Moreover, the indictment informed the defendant of the specified unlawful activities underlying these money laundering charges, and it alleged in detail the manner and means by which he extorted, took the money by fraud, and transferred it to and within the United States. It also made clear that the extortion and the fraud did occur in Ukraine. Furthermore, the indictment specified for every charged transaction, the date, the amount of funds involved, and the sending and receiving bank and account numbers. Your Honors, the defendant was indicted for engaging in monetary transactions. These transactions were clearly identified in Counts 2 through 8. For the same reasons, this Court has established what the essential elements of wire fraud and ITSPR and all of these elements were alleged in the indictment and sufficient notice provided to satisfy the other criteria. Turning to the sufficiency of the evidence on the wire fraud counts, the defense challenges only the infurtherance element of wire fraud. He argues that the wires had to contain proceeds, and he defines this under the insufficient clean funds test adopted by the District Court in the ITSP counts. But this definition is not what constitutes infurtherance. This Court has repeatedly made clear that, as has the Supreme Court, that in order to prove the infurtherance element, a wire must be incidental to an essential part or a step in the plot. It may conceal and it may perpetuate the fraud. It need not involve proceeds at all. It could be some entirely different wire transaction. Here, each wire transfer charged in Counts 25 through 29 was infurtherance of the defendant's scheme to defraud because it was designed to conceal the money that he unlawfully obtained so that he could continue his fraud and his theft of honest services. Indeed, Indictment Paragraphs 36 and 37 charge, as part of the wire fraud scheme, that the defendant hid this income, as well as his control over the coded bank accounts and his interest in these companies, from the people of Ukraine through false declarations that he filed in connection with his running for People's Deputy. Now, the evidence showed that when he believed that his dismissal as Prime Minister was imminent, that is when he purchased the Eurofed bank. And shortly thereafter, he was in fact dismissed as Prime Minister. He learned that he was under investigation in Ukraine and he feared that his accounts in Switzerland were going to be frozen. That includes the Carpo 53 account. The Carpo 53 account, Your Honours may recall, received money both from the Kiritschenko extortion and from the Naukovi fraud. And so, he did in fact close the Carpo 53 account and when he did that, he advised the banker that he wanted to break the link with Geneva. This was all about concealing the funds that were in that account. So, he sent two $14 million wires to Eurofed correspondent accounts here in the United States. Those are accounts 25 and 26. That's how that furthered the fraud. And then he also got two $48 million bearers checks, which he used to open secret accounts in the Bahamas. He closed the Bahama accounts about one year later and then he sent $9 million from that closure to one of the Eurofed correspondent accounts. That's count 28. Then he transferred $5.3 million from the Bahama account to a shell corporation that he controlled named Dugsbury. That's count 29. Four days after he filed his false asset declaration in connection with his run for People's Deputy, the defendant wired $24 million from his Eurofed bank to a Eurofed investment account. That's count 27. Throughout, Eurofed's money was almost entirely the defendant's and he controlled all of the investment decisions. Now, the plan, the defendant's plan, did not need to be as specific as, at this point years later, I'm going to wire the money to the United States, to correspondent banks in the United States, and I'm going to buy this bank in the process to enable me with doing it. His plan, as alleged, was to conceal, to enable himself to continue the fraud and the extortion and to conceal the assets that he had from the people of Ukraine. This was in furtherance of that scheme. Now, the district court found that the parallel counts under ITSP were not directly traceable, that they did not contain the tainted funds because there were sufficient clean funds in the accounts to cover them. But that is not the test for wire fraud, nor has it ever been. This is not actually an issue of first impression. This court has always been clear that the element is that it must be in furtherance of, and that was satisfied here. How about the argument that the indictment really, at least as to count 25 and 26, really relates to UESU, and that that was what was argued, that was what was indicted, and then once you take that out, at least as to the foundation for those transactions, you're missing counts 25 and 26. I understand Your Honor's question. That is not in fact what the indictment alleges. In so arguing, the defense points to a paragraph of the indictment that refers to the money laundering conspiracy, and the allegations in it are geared toward that part of the money laundering conspiracy involving the Somali funds. What the wire fraud allegations in the indictment are, are on page 15 of the indictment, paragraph 35, and there it specifies that it was part of the scheme to defraud that Lazarenko received at least $30 million from Mr. Kirichenko's company, ASS, and that he received at least $14 million from Naokvi State Farm. It specifically identified the money that was transferred. These amounts, parts of these amounts, went into the CARPO 53 account. CARPO 53 was not limited to the Somali funds, and the allegations that related to the money laundering conspiracy that talked about Somali along with other funds were talking about Somali for purposes of the context of that part of the indictment. But they were not limited, and in fact the wire fraud allegations specifically identify the funds relating to the non-UESU accounts. Unless your honors have further questions on that part, I'd like to turn to the ITSP account. The question for the court really is when the property was stolen or taken by fraud, and I admit there's some confusion about this below. In the government's brief, it was inartfully stated. We stated that the property was stolen or taken by fraud when the defendant received the funds from the Hungarian Naokvi account. What it should have said was that when he took the money from the Hungarian Naokvi account. But the relevant moment is the same. The moment is when the $1.205 million wire left Naokvi. The indictment alleged that the defendant... It's at the Posta Bank. It's at the Posta Bank, correct. And the account was a Naokvi account in the Hungarian Posta Bank. The indictment alleged that the defendant defrauded Naokvi, not Nikopol. The fraud is the kickback deal, the 50% that the defendant gets. So the defendant had the fraudulent kickback deal with Naokvi, particularly with Agofonov, the director of Naokvi. So therefore, the government had to prove that the $1.8 million wired to ABS contained more than $5,000 that he stole from Naokvi. And the money is not stolen or taken from Naokvi until it leaves Naokvi's control. And it is in Naokvi's control throughout its time, including at that Hungarian Posta Bank, the Naokvi account in Hungary. So it is taken by fraud. It is taken, the defendant gets a kickback. That's the fraudulent taking. The Nikopol wheat loan stuff is the fraudulent backdrop. That's how he sets up his entitlement to this kickback. But the fraudulent taking is the kickback itself, the money leaving the Naokvi account in Hungary. Okay, so then, and what's the evidence of that? Because we don't have any Mr. Agofonov is dead and there's no Posta Bank records, correct? Right. So we don't need the Posta Bank records. And the reason for that is because we don't need to trace the money through the Naokvi accounts. This is still all Naokvi. The bank account was in the name of Naokvi. The signatory was Naokvi's director, Agofonov. So all we need to show that leaves me with my question. We keep saying the same thing over and over, but it's like not sinking in to me, so maybe you can help me. Because, you know, you guys were in this a long time. And these names just flow off, you know, just like it's Smith. I've practiced saying them, Your Honor. So the money from the Posta Bank and the Naokvi corporate entity, you're saying just because it left there that that's the fraud? That's the fraud. That's the moment of the kickback. So the evidence was that the defendant has a pattern of taking 50 percent of the profits from various companies doing business in Ukraine. The evidence was that the defendant was heavily involved in Naokvi and that his deputy directed the Nikopol State Ferroalloy Factory to loan Naokvi $2.4 million. So the defendant basically is setting this up. I'll help you get this loan. I'm going to get a 50 percent kickback. And the loan was paid back. The loan was paid back, but the defraud is not from Nikopol. So it doesn't matter if the loan is paid back to Nikopol. The fraud was from Naokvi. Naokvi was entitled to this $2.4 million, and the director siphoned part of it off for himself for BMWs and paying credit card bills and so forth, and he gave half of it to the defendant. And the taking of that $1.2 million from Naokvi is what constitutes the fraud. And so we can trace, and we've outlined in the brief, more than $5,000 going from the moment of taking from the final Naokvi account, because it went through first the Van der Ploeg account, which Naokvi controlled, into the Hungarian Naokvi account. And so when the money is taken from the Hungarian Naokvi account is when it is taken and stolen from Naokvi. And then we have traced it from that taking from the Naokvi account through lip handle. It goes from the U.S. dollar account into the Swiss franc account, and then it's circulated through some fiduciary deposits, and then out it goes to ABS. And there is well more than $5,000 of that tainted funds with insufficient clean funds at every step. Okay, so you have to prove that there's not enough clean funds in the lip handle account. Is that correct? That is correct. And the proof on that is? The bank records themselves, Your Honor. The bank records and then the summary charts that Agent Tana prepared. But you have to assume then that the 1.205 is tainted, correct? It is, because that is what is taken. I know you keep saying it is because you believe it is, but that doesn't, you know, you're right back, you can argue until you're blue in the face, but we're trying to get the facts understood here. So you say it is, it is, it is. But all of that ties back to your premise that the 1.205 was basically extorted or taken from the NAGOV. Well, let me continue then, if it helps Your Honor, to walk through a few items more of the evidence there. In addition to the defendant's pattern of taking 50 percent, and this is roughly 50 percent, and the fact that he directed the loan in the first place, there was evidence that NAGOV had no financial relationship with Lip Handle, that the defendant told the banker for Lip Handle that the NAGOV Hungarian account payment was, quote, a commission, which is just as he described the 50 percent payments from Kirichenko, and that's at Government Excerpt of Record 40203. There's evidence of the quid pro quo, that the defendant signed Directive 100, which included NAGOV on a short list of companies authorized to export. And I believe that all of these, that's all I've got on my list right here, Your Honor. But I believe that all of this is sufficient evidence, which is the standard taken in the light most favorable to the government, whether a rational trier of fact could have found the elements beyond a reasonable doubt. And this is sufficient for that. And, in fact, the point that seems to be most heavily contested by the defendant is the tracing. But, again, if Your Honor looks at what the critical moment of taking is, I believe that's resolved. The final point argued by the defendant is the retroactive misjoinder argument. And he argues that this required reversal, or a new trial, rather, on what he was arguing here was on Count 31, because his argument basically is that the amounts of money involved in UESU and GHP and the dismissed counts were so large that the jury basically threw up its hands and was unable and unwilling to tackle the problem of differentiating clean funds from dirty. But that task of differentiating clean funds from dirty was not relevant to the wire fraud in furtherance element, nor is it relevant to money laundering, which just requires that the accounts be commingled. If anything, it's only relevant to the ITSP account, and, again, only through the lip handle account, which the bank records are absolute on that. And the bank records, in and of themselves, independent of anything else, prove that more than $5,000 came from that Hungarian Naukovi account. Which exhibits would that be in? The lip handle account. Yes. The lip handle account is Exhibit 2. It's at GER 462. And the couple of pages after that are the detailed bank allegations. Thank you. Bank statements. But that's the chart. And the last thing that the defense talks about are the couple of statements in the government's closing. This was a three-month trial, and the closings went on for an extended period of time. They object to a couple of statements by the government counsel. One is that the government closing saying, the context of it was, the evidence in this case shows that throughout this period of time, the only position the defendant held was an official position. The only thing he did was exercise his official authority. He was never engaged in any legitimate business. And then the government, the next sentence clarifies, he never received legitimately any income from Kirichanko or from Naukovi State Farms. Now, the district court instructed that arguments of counsel are not evidence, and their own memories control. But beyond this, Mr. Metz and Mr. Krug talked about the awareness of any legitimate business activities in the CARPO 53 and lip handle accounts. And what they talked about was that there, that meant that there was nothing in the company showing that they were legitimate, that they were more than just shells. Mr. Krug testified that he didn't recall any real business transactions in the account, that they served as depositories for funds. And finally, the government closing statement regarding Count 31. The government did not confuse the jury as to whether, what the proper standard was for reviewing an ITSP count. When talking about the money laundering counts, the government referred to commingled and tainted accounts. When it talked about the ITSP account, what it stated was only just that the, that the wires contained fraud proceeds. It did not mention taint or commingling at all. And that's an excerpt of record 494 to 495. Moreover, the defense had objected on a different basis, and so this is subjected to plain error review. Unless there are any further questions, I'll submit. Thank you. Thank you. We have about two minutes rebuttal. Two minutes. Until now, the only foreign crimes listed as predicate for money laundering under 18 U.S.C. 56 and 57 were drug trafficking, bank fraud, and certain crimes of violence, including murder, kidnapping, robbery, extortion, and use of explosives. This list is expanded to some extent by Section 315. When you say listed, you mean listed in the statute or listed in the indictment or what? I am now reading the Department of Justice report in 2001, the Bush Department, Department of Justice, which says until 2001, only certain crimes of violence, including extortion, were money laundering predicates. It's now expanded to include bribery of a public official and misappropriation of public funds. We are saying to a foreign citizen that if you were so stupid as to consider that the Department of Justice had a rational reading of the money laundering statute, and when it said that only it was crimes of violence such as extortion, it's now been expanded to include bribery and misappropriation of public funds. We can jail you because, in fact, there is another reading of the term extortion that you could divine from the Evans opinion some years before. We would be outraged. We would be outraged if a foreign government played those kind of tricks on our citizens. They get a clear statement from their Department of Justice, and then they're told, no, it's wrong. There's a completely different reading of the law. That is a reasonable reading of the statute. It's the Department of Justice's reading of the statute. It is a controlling reading of the statute, and under Santos and the rule of lenity it must be accepted the money laundering offenses have to go. The government just made the argument why the wire fraud counts all have to go. They said the reason the money went to the United States in 1997 is that Pavel Lazarenko learned he was going to be dismissed as prime minister of Ukraine. There was no plan in 1992 with the cattle deal that he would be first vice prime minister and then prime minister and then get dismissed. What they are saying is in 1997 he found a reason to move money out of his Swiss accounts into American accounts. That had nothing to do. It was an after-the-fact event. It had nothing to do with whatever allegation of fraud there was as to 1992, and therefore it could be charged as a laundering act. It can't be charged as a part of the wire fraud scheme involving the COVID. And the final thing is we are left with this. This grand jury never considered before it indicted that it had to consider whether Lazarenko had ever violated Ukrainian law. It indicted him without considering that at all. That's why there's no reference to Ukrainian criminal violations in the indictment. If this court approves that practice, it is saying that a citizen, Lazarenko, can be convicted solely because their conduct in Ukraine is offensive to American laws, not Ukrainian laws. We don't have to prove that. And if it adopts that principle, all of our citizens around the world are in grave danger of being prosecuted under a similar theory where they go to prison for 10 years because they do something in the United States which is illegal. Some money reaches a foreign country, and that country decides that money was obtained by something in violation of their laws, even though it's clearly legal under United States laws. We can't permit that. Thank you. Thank you. Thank both counsel for your arguments, also the briefs, which were quite helpful. The case of United States v. Lazarenko is now submitted, and we'll adjourn for the morning.
judges: Tashima, McKeown, Gould